UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

DANIEL PELAYO and KRISTINA KAUTS,

                  Plaintiffs,        09 Civ. 8879 (JGK)

        - against -          MEMORANDUM OPINION AND
                                      ORDER

THE PORT AUTHORITY, ET AL.,

                  Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

    Defendants, the Port Authority of New York and New Jersey
("PA"), PA Sergeant Gravano, and PA Officer Robert Sznurkowski
(collectively, the "PA defendants"), have moved for summary
judgment pursuant to Federal Rule of Civil Procedure 56 seeking
to dismiss the claims alleged against them by plaintiffs Daniel
Pelayo and Kristina Kauts.  The events giving rise to this
lawsuit took place in the early morning hours of June 3, 2009
when Kauts and Pelayo were detained at the John F. Kennedy
Airport ("JFK").  (Pls.' Resp. to Defs.' R. 56.1 Stmt. ("Pls.'
Resp."), ¶¶ 4, 22, 25.)  The plaintiffs allege claims for false
arrest, excessive force, and battery in violation of 42 U.S.C.
§ 1983 and New York law.  The claims against the PA are based on
a theory of vicarious liability.

    This Court previously dismissed the plaintiffs' claims
against Customs and Border Protection ("CBP") officers
Bridgeforth and Van Ihsem in their official capacity, as well as

1

Pelayo's false arrest claims against the CBP officers and the PA
defendants.  This Court has also dismissed Pelayo's excessive
force claim against PA Officer Sznurkowski.  Kauts has since
settled her false arrest claim against the CBP officers in their
individual capacities.  Consequently, only Kauts's claim against
the PA defendants for false arrest, Pelayo's excessive force
claim against Sergeant Gravano, and Pelayo's battery claim
against Sergeant Gravano and the PA remain.

## I.

The PA defendants have moved for summary judgment on the
grounds that the PA officers' conduct did not violate the United
States Constitution or New York law.  The standard for granting
summary judgment is well established.  "The court shall grant
summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); see also
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[T]he
trial court's task at the summary judgment motion stage of the
litigation is carefully limited to discerning whether there are
any genuine issues of material fact to be tried, not to deciding
them.  Its duty, in short, is confined at this point to issue-
finding; it does not extend to issue-resolution." Gallo v.
Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224

(2d Cir. 1994).  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify the material facts and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Chepilko v. Cigna Group Ins., No. 08 Civ. 4033, 2012 WL 2421536, at *1 (S.D.N.Y. June 27, 2012).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

If the moving party meets its burden, the burden shifts to the nonmoving party to bring forward "specific facts showing a genuine issue for trial." Ovesen v. Mitsubishi Heavy Indus. of

3

Am., Inc., No. 04 Civ. 2849, 2012 WL 677953, at *1 (S.D.N.Y. Mar. 1, 2012) (citation omitted).  The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); Ovesen, 2012 WL 677953, at *1.


                              II.

        The following facts are undisputed unless otherwise noted. The plaintiffs, an engaged couple, were returning from a trip to the Dominican Republic on June 3, 2009.  (Pls.' Resp. ¶¶ 17, 22.)  At 12:54am, when they presented their passports to CBP at JFK, an Inter City Correspondence alert ("ICC") notified the CBP officers of an Outstanding Order of Protection ("OOP") in favor of Kauts against Pelayo.  (Pls.' Resp. ¶¶ 22-25.)  The CBP officers referred Pelayo to a secondary area to verify whether the ICC alert indeed referred to Pelayo.  (Pls.' Resp. ¶ 25.) Kauts testified that she went to the secondary area with Pelayo "thinking that it was nothing. . . .  Because I'm from Florida and I'm a young woman in JFK Airport, so I went with my fiancé to where he goes."  (Kauts Dep. Tr. at 21-22.)

                               4

Pelayo and Kauts waited in the secondary area unaccompanied by CBP or PA officers; eventually a CBP officer called Pelayo to a desk and Pelayo handed the officer his documentation. (Kauts Dep. Tr. at 22-23.) Kauts represents that one CBP officer told her "to wait right here." (Kauts Dep. Tr. at 27.) After Pelayo surrendered his passport, the CBP officers allegedly asked Kauts for her passport, asked her to take a seat, and asked the plaintiffs to separate. (Kauts Dep. Tr. at 38.)

The CBP officers informed Kauts and Pelayo that they were separated because of the OOP, to which Kauts replied, "[t]here is no order of protection," and she "pleaded and begged with [the CBP officer] at the front" to let her make a phone call or retrieve the OOP dismissal paperwork. (Kauts Dep. Tr. at 41-42; see Pls.' Resp. ¶ 44.) But the CBP officer allegedly refused, saying, "I can't let you go. You have to wait here until we figure out what we have to do." (Kauts Dep. Tr. at 42.) Kauts maintains that she asked "[w]hy am I being held?" and "[b]asically, the whole time, [she] just pleaded if [she] could leave." (Kauts Dep. Tr. at 47.) A person she identified as "the main [CBP] officer" reportedly responded, "Absolutely not. You cannot go anywhere because you committed a crime." (Kauts Dep. Tr. at 48.) She asked the officer, "Well, if I try to leave, what will happen?" to which she claims that he replied, "Then I will personally put you in handcuffs and stop you from

leaving." (Kauts Dep. Tr. at 48.) Kauts was never put in handcuffs or searched. (Kauts Dep. Tr. at 54-55.)

Meanwhile, between 3:00am and 4:00am, the CBP officer faxed Kauts's and Pelayo's travel and identity documents, as well as the OOP, to the PA. (Pls.' Resp. ¶¶ 31, 33.) Upon his arrival at PA headquarters between 5:00am and 5:15am, Sergeant Gravano received the OOP. (Gravano Dep. Tr. at 5.) The OOP indicated that it was issued on May 16, 2008 and that it would remain effective until May 17, 2010. (Pls.' Resp. ¶ 32.) However, the OOP had already been vacated, unbeknownst to the CBP or PA officers. (Pls.' Resp. ¶ 32.) Based on the information contained in the OOP, Sergeant Gravano and Officer Sznurkowski went to JFK between 6:00am and 6:30am to arrest Pelayo. (Pls.' Resp. ¶ 35.)

The PA officers led Pelayo to a hallway, patted him down, asked him to place his hands behind his back, and Officer Sznurkowski handcuffed him for transport to PA headquarters. (Pelayo Dep. Tr. at 185, 193-95; Gravano Dep. Tr. at 14.) Pelayo claims that on their way to the squad car while he was handcuffed he stated, "[t]here's no Order of Protection in effect," to which Sergeant Gravano allegedly replied, "[y]ou shouldn't be worried if there's an Order of Protection in effect or not. You should be worried why you had an Order of Protection to begin with." (Pelayo Dep. Tr. at 190.) Sergeant

Gravano maintains that neither he, nor any other PA officer that he knows of, made that statement to Pelayo. (Gravano Dep. Tr. at 19-20.)

Meanwhile, after the PA officers arrived at the secondary area where Kauts and Pelayo were waiting, they escorted Kauts into a room "around the corner" where a PA officer "told [her] to write down the things that [Pelayo] had done to [her]" on page two of the New York State Domestic Incident Report form ("DIR"). (Kauts Dep. Tr. at 53, 55-56; Pls.' Resp. ¶¶ 37-38.) This occurred at approximately 6:25am. (Denalli Decl., Ex. P ("DIR").) Kauts claims that she stated, "This is a false arrest. This should not be happening. He's done nothing wrong. We're just trying to go home." (Kauts. Dep. Tr. at 175.) She wrote on page two of the DIR form that the OOP "is an old order which was dropped on August 22, 2008." (Kauts Dep. Tr. at 60-61; see also DIR.)

After she filled out the DIR form, the PA officers allegedly "made [Kauts] wait in the room until they were done handcuffing Daniel Pelayo," then the PA officers escorted her out of JFK. (Kauts Dep. Tr. at 62.) During this time, the PA officers did not threaten her, handcuff her, or yell at her; she did not ask the officers to leave, and she did not refuse to comply with the request that she fill out the form. (Pls.' Resp. ¶ 39; Gravano Dep. Tr. at 11.) Further, Sergeant Gravano

testified that "she could refuse" to cooperate: "She could say
I'm not doing this and we would put that on the portion of the
DIR." (Gravano Dep. Tr. at 11.)  After she filled out the DIR
form, two PA officers escorted Kauts from Terminal 4 without
handcuffing her, holding her hands, or speaking with her.
(Pls.' Resp. ¶ 40.)  Kauts remained with the PA officers for a
total time of 20 to 30 minutes.  (Pls.' Resp. ¶ 38.)
Accordingly, she left JFK at approximately 7:00am.

The parties dispute whether Kauts's referral to the
secondary area occurred pursuant to CBP or PA policy.  The
plaintiffs argue that on June 3, 2009 the PA "had an ongoing
arrangement and procedure with CBP which required CBP to hold
both the subject of an OOP and the person protected by the OOP
if that person was travelling with the subject." (Pls.' Resp.
¶¶ 26, 29.)  The PA defendants claim that "[t]he [PA] does not
order or direct CBP to hold onto the protected party and there
is no [PA] policy requiring a protected party to be held by the
CBP." (Defs.' R. 56.1 Stmt. ¶ 29.)  The PA maintains that "it
was CBP's policy to refer a person accompanying the subject of
the OOP into the CBP secondary area." (Defs.' R. 56.1 Stmt.
¶ 26).  Sergeant Gravano explained that Kauts was taken to the
secondary area because the PA "like[s] to interview the
protected party . . . and the state mandated that [the PA] fill
out a DIR . . . to make sure they were not threatened or hurt in

8

any way." (Gravano Dep. Tr. at 10.) Although the PA "likes" to conduct these interviews, they "don't always necessarily get to do th[em]." (Gravano Dep. Tr. at 10.) Sergeant Gravano clarified that he did "not order[] [the CBP] to hold on to anybody," and he testified, "I don't think Customs would follow my orders." (Gravano Dep. Tr. at 57.) Officer Sznurkowski testified that the PA had no policy that required that the protected party be held. (Sznurkowski Dep. Tr. at 13.)

CBP Officer Van Ihsem acknowledged that on June 3, 2009, CBP's procedure was to "hold both people involved in an order of protection case." (Van Ihsem Dep. Tr. at 28.) CBP Officer Van Ihsem represented that Kauts "could have walked out if she wanted to, but [CBP] would have asked her to stay behind." (Van Ihsem Dep. Tr. at 23.) But "if she had said no, I want to leave" she would have been permitted to leave, "we wouldn't forcibly keep her there." (Van Ihsem Dep. Tr. at 23.) Officer Bridgeforth further explained that as far as the CBP was concerned, Pelayo and Kauts could not leave because CBP had not yet approved their joint customs declaration. (Bridgeforth Dep. Tr. at 29-32, 38-40.)

Officer Van Ihsem stated that if the PA had requested that both parties involved in an OOP remain held, CBP would hold them. (Van Ihsem Dep. Tr. at 30.) He also indicated that if the PA had indicated that it wanted to interview Pelayo and

9

Kauts that would be done "[v]erbally over the phone." (Van
Ihsem Dep. Tr. at 34-35.) The only official record of that
request would be a report memorializing the phone call. (Van
Ihsem Dep. Tr. at 35-36.) At the September 17, 2012 hearing on
this motion, the parties represented that no such report was
produced in this case.

Officers Bridgeforth and Van Ihsem testified that after
June 3, 2009, CBP instituted a new policy concerning persons
protected by an OOP. (Van Ihsem Dep. Tr. at 29; see also
Bridgeforth Dep. Tr. at 19-20.) This new policy requires a
protected person who wishes to stay in the secondary area to
sign a document stating that "they know that they are free to
leave at any time and that they are remaining behind on their
own free will." (Van Ihsem Dep. Tr. at 29; see also Bridgeforth
Dep. Tr. at 19-20.)

Once at PA headquarters, at about 6:42am, Officer
Sznurkowski removed Pelayo's handcuffs and placed Pelayo in a
cell while Officer Sznurkowski completed the arrest processing.
(Pelayo Dep. Tr. at 198-99; Denalli Decl., Ex. Q ("PA Cell
Log").) Pelayo claims that, after the processing had been
completed, Sergeant Gravano approached his cell and informed him
that he would be going to Queens Central Booking ("QCB") and
opened the cell and handcuffed him. (Pelayo Dep. Tr. at 201-
03.) Pelayo contends that Sergeant Gravano escorted him to

another room where he sat him down at a desk, "handcuffed [his] right wrist, pulled it across his body[,] and cuffed the right wrist to a bar on [his] left side." [1]  (Pls.' Resp. ¶ 41; see also Pelayo Dep. Tr. at 204-05.)  Officer Sznurkowski did not handcuff Pelayo and cannot recall whether Sergeant Gravano handcuffed him, although he states that it would "not [be] customary for the sergeant to cuff." (Sznurkowski Dep. Tr. at 23; see also Pls.' Resp. ¶ 41.)  Pelayo is certain that Sergeant Gravano handcuffed him. (Pelayo Dep. Tr. at 202-03; Pls.' Resp. ¶ 41.)  Sergeant Gravano maintains, "I never handcuffed him." (Gravano Dep. Tr. at 18.)  However, he did not recall who did handcuff Pelayo. (Gravano Dep. Tr. at 34.)  Sergeant Gravano explained further that he "can't remember the last time [he] handcuffed someone] . . . once [he] got promoted, you know, as a matter of course unless it's absolutely necessary," (Gravano Dep. Tr. at 19), and "as a matter of course it is the two transport officers that would do the handcuffing.  Sometimes the AO, arresting officer, would step up and may handcuff the prisoner to get ready for transport." (Gravano Dep. Tr. at 34.) Officer Sznurkowski confirmed this when he testified that "[u]sually it's the transporting officer who does the cuffing." (Sznurkowski Dep. Tr. at 23.)

---

[1] Pelayo testified in his deposition that Sergeant Gravano removed his left handcuff and cuffed his left arm to the bar on the right side of his body.  (Pelayo Dep. Tr. at 204-05, 207.)

Pelayo claims that he complained to Sergeant Gravano about his handcuffs being too tight. (Defs.' R. 56.1 Stmt. ¶ 42.) He claims that that the handcuffs "were going into [his] wrists," and that he asked Sergeant Gravano, "Can you loosen them?" to which Sergeant Gravano replied, "No.  That's the way they go." (Pelayo Dep. Tr. at 214.) Pelayo claims that on his way to the transport van he became loud, "not screaming but loud.  Like this hurts, can you loosen the cuffs[?]" (Pelayo Dep. Tr. at 215.) Sergeant Gravano claims that he never heard Pelayo complain about the tightness of the handcuffs, and Pelayo appeared "calm and cooperative" the whole time. (Gravano Dep. Tr. at 19-20, 28, 30.) Officer Sznurkowski testified that he never heard Pelayo complain and described it as "a very uneventful situation." (Sznurkowski Dep. Tr. at 24.) Pelayo testified that before entering QCB, one of the "cops" loosened the handcuffs and said, "Sorry about that." (Pelayo Dep. Tr. at 226-27.)

Once at QCB, Pelayo did not ask to be seen by EMS personnel, nor did he ask for an ambulance. (Defs.' R. 56.1 Stmt. ¶ 43; Pelayo Dep. Tr. at 233.) Pelayo testified that he complained to an NYPD officer, "Man, my wrist is bothering me." (Pelayo Dep. Tr. at 230.) However, he did not want to go to the hospital because he was "already [at QCB], [and he] didn't want to delay the process any more." (Pelayo Dep. Tr. at 230-31.)

An NYPD officer allegedly informed him that if he complained
about pain he would have to be taken to the hospital and that
would "delay your process." (Pelayo Dep. Tr. at 231; Pls.'
Resp. ¶ 43.) Pelayo was released from QCB when Kauts presented
a certified copy of the Order of Dismissal of the OOP to the
Queens County District Attorney's Office. (Defs.' R. 56.1 Stmt.
¶ 44.)

Pelayo complains that his right wrist was bruised and
appeared "dark . . . from redish to purple" because of the tight
handcuffs. (Pls.' Resp. ¶ 43; Pelayo Dep. Tr. at 233-36.)
Because Pelayo believed his injury would "just go away," he did
not see his primary care physician until several days after his
arrest. (Pelayo Dep. Tr. at 259.) When he did, he complained
that his wrist "hurt . . . and then it got worse," and "when it
was like rainy days, it would hurt more . . . when [he] would
make motions with [his] wrist, it felt like it was something
there." (Pelayo Dep. Tr. at 259, 261.) His primary care
physician ordered an MRI, which indicated to the primary care
physician that Pelayo needed to see a specialist. (Pelayo Dep.
Tr. at 261-64.) An orthopedist determined that he had "torn
cartilage" and recommended physical therapy, or, if that did not
work, surgery. (Pelayo Dep. Tr. at 268.) Pelayo attended
physical therapy two or three times per week for approximately
two weeks, and, once he began improving, he attended physical

13

therapy once or twice per week until the orthopedist instructed him to stop.  (Pelayo Dep. Tr. at 269-71.)

Since 2005, Pelayo has worked as a merchandiser at Empire Merchants, a liquor distributor with locations in the five boroughs of New York City.  (Pelayo Dep. Tr. at 15.)  As a result of his wrist injury, Pelayo missed one or two days of work.  (Pelayo Dep. Tr. at 250-51.)  When he returned to work, he could not resume his usual responsibilities and was given "light [work] to do" because his wrist was hurting.  (Pelayo Dep. Tr. at 252.)

## III.

Kauts asserts a claim for false arrest in violation of 42 U.S.C. § 1983 and New York law based on her detention for over six hours at JFK.  The PA defendants contend that they were not responsible for Kauts's detention at JFK while she was held by CBP Officers.  They assert that they did not intend to detain her and that she never objected to filling out the DIR form. They also assert that the individual PA officers are entitled to qualified immunity.

## A.

Section 1983 claims for false arrest are "substantially the same" as false arrest claims under New York law.  Weyant v.

14

Okst, 101 F.3d 845, 852 (2d Cir. 1996).  Both claims require a
showing that "(1) the defendant intended to confine [the
plaintiff], (2) the plaintiff was conscious of the confinement,
(3) the plaintiff did not consent to the confinement[,] and (4)
the confinement was not otherwise privileged."  See id. at 853
(quoting Broughton v. State, 335 N.E.2d 310, 314 (N.Y. 1975))
(first alteration in original and internal quotation marks
omitted).

　　　Kauts's claim fails at the first step.  She has offered
insufficient evidence from which a reasonable juror could
conclude that the PA officers intended to confine her.  Kauts
claims that she was held falsely for six hours and she blames
the PA defendants for this entire period of alleged detention.
She claims that the PA and the CBP had an arrangement that
"required" the CBP to hold her as the person protected by an OOP
who was travelling with the subject of the OOP.  This contention
fails for several reasons.  There is no documentary evidence of
any such policy and no testimony by any officials with knowledge
of how and when such a policy was ever established.  Moreover,
it is not plausible that the federal CBP would be subject to
direction from the PA.  As Sergeant Gravano testified, he
doubted that the CBP would follow his orders.  (Gravano Dep. Tr.
at 57.)  Further, CBP changed its policy and decided not to hold
persons protected by an OOP without a hold-harmless agreement,

and there is no evidence that CBP needed the permission of the
PA to do so.  Moreover, there is even an absence of evidence
that it was the PA policy to hold persons who were protected by
an OOP, whether or not they were detained by the CBP.  As
Sergeant Gravano explained, the PA did not always hold the
protected party under an OOP, but the PA "liked to have the
protected party present" to fill out the DIR form.  (Gravano
Dep. Tr. at 10.)  Sergeant Gravano also testified that Kauts
could have refused to fill out the DIR form, which would have
been noted on the DIR form.  (Gravano Dep. Tr. at 11.)

     The evidence indicates that CBP—not the PA defendants—was
in charge while Kauts waited from about 12:54am until about
6:25am when she filled out the DIR form for the PA officers.
During that period, there is no evidence that any PA
representative asked that Kauts be held.  Officer Van Ihsem
claimed that CBP would hold both parties involved in an OOP if
the PA requested their detention.  (Van Ihsem Dep. Tr. at 30.)
However, there is no record of any PA officer making such a
request, and neither Officer Bridgeforth, nor Officer Van Ihsem
stated that they had received any such request.  (Van Ihsem Tr.
at 65.)  Instead, CBP Officer Van Ihsem recognized that it was
CBP's policy, at the time, to "hold both people involved in an
order of protection case." (Van Ihsem Dep. Tr. at 28.)  Officer
Bridgeforth confirmed that CBP would not have permitted Kauts to

leave the secondary area because her customs declaration was not complete.  (Bridgeforth Dep. Tr. at 29-32, 38-40.)

Sergeant Gravano and Officer Sznurkowski did not become aware that Pelayo and Kauts had been detained until 5:15am when Sergeant Gravano arrived at PA headquarters.  The plaintiffs do not contend that any other PA officer knew that Kauts and Pelayo were being held at JFK.  Consequently, it is only possible that the PA could have been responsible for Kauts's detention after 5:15am.  The bulk of the time she spent detained at JFK—from 12:54am until her release at approximately 7:00am—was with CBP, under CBP's policy.

The only portion of her alleged detention for which the PA could be responsible occurred when the PA officers asked Kauts to fill out the DIR form.  Kauts remained with the PA officers for under 30 minutes.  (Pls.' Resp. ¶ 39.)  While she filled out the DIR form she cried that Pelayo had been falsely arrested, but the PA officers never threatened or handcuffed her, she did not ask the officers to let her leave, nor did she refuse to comply with the request that she fill out the DIR form.  (Pls.' Resp. ¶ 39; Gravano Dep. Tr. at 11.)

There is no evidence that Kauts was not free to leave if she decided not to cooperate and not to fill out the DIR form.  Therefore, the plaintiff has failed to offer evidence from which

a reasonable juror could find that the PA defendants intended to confine Kauts.[2]

Moreover, Kauts's false arrest claim also fails because she has offered insufficient evidence from which a reasonable juror could conclude that she objected to any detention by the PA. See Weyant, 101 F.3d at 853. Kauts never objected to the PA's request that she fill out the DIR form. Although Kauts claims that she cried, "This is a false arrest. This should not be happening. He's done nothing wrong. We're just trying to go home," (Kauts Dep. Tr. at 175), her objection was to Pelayo's arrest, not to her own circumstances. Kauts admits that "she did not ask any of [the PA officers] to leave and she did not refuse to complete page two of the DIR." (Pls.' Resp. ¶ 39.) Kauts's behavior and statements indicated that she consented to remaining with the PA officers for the purpose of filling out the DIR form.

---

[2] The PA defendants have not relied on the numerous cases that have found some administrative intrusions to be reasonable where the Government sought to prevent hazardous conditions. See Bd. of Ed. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002) (quoting Treasury Emps. v. Von Raab, 489 U.S. 656, 667-68 (1989) (internal quotation marks omitted)); see, e.g., Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 455 (1990) (upholding brief stops at a sobriety checkpoint); United States v. Martinez-Fuerte, 428 U.S. 543, 566-67 (1976) (holding that "stops for brief questioning [about immigration status at the border] routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant.").

Because Kauts has failed to produce evidence from which a reasonable juror could conclude that the PA defendants falsely arrested her, her federal and state claims against both the PA and the individual officers based on the alleged false arrest fails as a matter of law.[3]

**B.**

The PA officers are also entitled to qualified immunity. Qualified immunity shields government officials from liability from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  If a right is clearly established, qualified immunity will nonetheless function effectively as a shield from liability when "officers of reasonable competence could disagree on whether the conduct at issue was legal." Munoz v. City of N.Y., No. 04 Civ. 1105, 2008 WL 464236, at *6 (S.D.N.Y. Feb. 20, 2008); see Malley v. Briggs, 475 U.S. 335, 341 (1986); Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir.

---

[3] The alleged liability of the PA is based on a theory of vicarious liability for the alleged false arrest of Kauts by the PA officers in violation of New York law.  Because Kauts has no claim for false arrest under New York law, there can be no vicarious liability for the PA and the claim against the PA for false arrest must be dismissed.

1995); <u>Golino v. City of New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991).

The individual's "right not to be arrested without probable cause," is clearly established.  <u>Lee v. Sandberg</u>, 136 F.3d 94, 102 (2d Cir. 1997).  However, if the officers' "actions were not objectively unreasonable at the time they were taken," the officers will be entitled to qualified immunity.  <u>Id</u>.

In this case, the PA officers asked Kauts to fill out the DIR form and she completed it.  She remained with the PA officers for between twenty and thirty minutes without complaint.  At the very least, reasonable officers could disagree over whether the actions of the PA officers constituted any arrest at all and whether Kauts consented to remaining with the PA officers to fill out the DIR form.

For the reasons explained above, the defendants' motion for summary judgment on Kauts's claim of false arrest in violation of federal and state law is **granted**.


                                   IV.

The PA defendants move for summary judgment dismissing Pelayo's claim for excessive force and battery against Sergeant Gravano and the PA.  However, Pelayo has proffered sufficient evidence to support his claim for excessive force in violation

                                   20

of the Fourth Amendment and battery in violation of New York law.

A police officer's use of force is "excessive" in violation of the Fourth Amendment if it is "objectively unreasonable" in light of the facts and circumstances known to the officer. Lennon, 66 F.3d at 425; see also Maxwell v. City of N.Y, 380 F.3d 106, 108 (2d Cir. 2004).  It is well established that "[n]ot every push or shove" is excessive.  Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.), overruled on other grounds by Graham v. Connor, 490 U.S. 386 (1989).  To determine whether the amount of force applied to the plaintiff was reasonable the Court should consider: "[i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 386; see Weather v. City of Mount Vernon, 474 F. App'x 821, 823 (2d Cir. 2012).

A battery claim under New York law requires proof "[i] that there was bodily contact, [ii] that the contact was offensive, and [iii] that the defendant intended to make the contact without the plaintiff's consent."  Bastein v. Sotto, 749 N.Y.S.2d 538, 539 (App. Div. 2002); see Charkhy v. Altman, 678 N.Y.S.2d 40, 41 (App. Div. 1998).  Similar to a claim for

21

excessive force under § 1983, a state law claim for battery against a police officer in the course of an arrest requires the plaintiff to prove that the officer's use of force was "excessive or objectively unreasonable under the circumstances." Holland v. City of Poughkeepsie, 935 N.Y.S.2d 583, 590 (App. Div. 2011).

Excessive force claims require "serious or harmful," not "de minimis" use of force. Drummond v. Castro, 522 F. Supp. 2d 667, 678-79 (S.D.N.Y. 2007) (internal quotation marks and citations omitted). To assess a claim for excessive force based on handcuffing, the Court should consider evidence that: "1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Matthews v. City of N.Y., No. 10-CV-4991, 2012 WL 3839505, at *17 (E.D.N.Y. Sept. 5, 2012) (quoting Esmont v. City of N.Y., 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)).

The plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment. See, e.g., Mickle v. Morin, 297 F.3d 114, 121-22 (2d Cir. 2002). There is evidence from Pelayo's deposition testimony that Sergeant Gravano handcuffed him and that Sergeant Gravano or another PA officer heard his complaints. Pelayo testified that he complained that

22

his handcuffs were uncomfortably tight.  He stated that they were "going into [his] wrists."  (Pelayo Dep. Tr. at 214.) Pelayo also testified that he complained to Sergeant Gravano and the transport officers about his handcuffs being too tight to no avail.  Sergeant Gravano allegedly replied, "No.  That's the way they go."  (Pelayo Dep. Tr. at 214.)  Pelayo "loud[ly]" reiterated his complaints to the officers in the transport van. (Pelayo Dep. Tr. at 215.)  Once at QCB, a police officer loosened his handcuffs and said, "Sorry about that."  (Pelayo Dep. Tr. at 226-27.)

Pelayo testified that he suffered lasting injuries as a result of the tightness of the handcuffs.  He felt pain at QCB and complained to an NYPD officer, "Man, my wrist is bothering me."  (Pelayo Dep. Tr. at 230.)  He did not seek medical attention while in custody because he did not want to delay his release from QCB.  However, he saw his primary care physician a few days after his arrest and reported that his wrist "hurt . . . when it was like rainy days, it would hurt more . . . when [he] would make motions with [his] wrist, it felt like it was something there."  (Pelayo Dep. Tr. at 259, 261.)  After an MRI, an orthopedist determined that he had "torn cartilage" and recommended physical therapy, which he attended for several weeks.  (Pelayo Dep. Tr. at 265-71.)  Pelayo missed at least one

day of work and was assigned "light" tasks upon his return due to his injury.  (Pelayo Dep. Tr. at 252.)

The plaintiff's sworn assertions of excessive force causing injury and requiring medical attention raise sufficient questions of material fact and preclude their resolution as a matter of law on a motion for summary judgment.  See Mickle, 297 F.3d at 120.  However, Pelayo's claim for excessive force and battery is directed solely against Sergeant Gravano who he claims was responsible for applying the handcuffs and ignoring his claim for relief.  Sergeant Gravano's denial that he handcuffed Pelayo raises an issue of material fact that cannot be resolved on a motion for summary judgment.

The PA itself is potentially liable on the basis of vicarious liability for the state claim of battery.  See Holland, 935 N.Y.S.2d at 589.  Accordingly, the defendants' motion for summary judgment on Pelayo's claim of excessive force in violation of federal law against Sergeant Gravano and for battery in violation of state law against Sergeant Gravano and the PA is **denied**.[4]

**V.**

The defendants have moved to dismiss the plaintiffs' claims for punitive damages.  The PA argues that punitive damages are

_____

[4] Sergeant Gravano has not alleged that he is entitled to qualified immunity on the excessive force claim.

unavailable against municipalities and their subsidiaries in

§ 1983 suits.   See City of Newport v. Fact Concerts, Inc., 453

U.S. 247, 271 (1981).   The individual defendants represent that

punitive damages are inappropriate in this case because the

defendants did not violate federal law wantonly, willfully, or

with malicious intent.   See Ragin v. Harry Macklowe Real Estate

Co., 6 F.3d 898, 909 (2d Cir. 1993).   The plaintiffs have

forfeited any claim for punitive damages because they failed to

respond to these arguments.


CONCLUSION

The Court has considered all of the arguments raised by the

parties.   To the extent not specifically addressed, the

arguments are either moot or without merit.   The Defendants'

Motion for Summary Judgment is **granted in part and denied in

part**.   The Clerk is directed to close **Docket No. 49**.

SO ORDERED.

Dated:   New York, New York
         September 27, 2012

                                          John G. Koeltl
                                    United States District Judge